## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-150 (JDB)** |
| | : | |
| **NATHAN DONALD PELHAM,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Nathan Donald Pelham to six months of incarceration, 60 hours of community service, and $500 in restitution.

### I.  Introduction

Defendant Nathan Donald Pelham, age 41 and the co-owner of a home construction and renovation business, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Pelham pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained below, a sentence of incarceration is appropriate.  Pelham was not violent on January 6, 2021—he entered and left the Capitol after just a few minutes—but when told to self-surrender, Pelham engaged in a multi-day standoff with police in which he fired a gun at officers.  And while Pelham ultimately surrendered, he was dishonest with law enforcement, both before and after his arrest, about what he did at the Capitol.

The Court must also consider that Pelham's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.

Pelham trespassed over the restricted perimeter around the Capitol grounds wearing a black hoodie, black scarf, googles, and black hat with the "Proud Boys" insignia on it.  He made his way to the Capitol and entered through the broken Senate Wing Door where he remained for a little over seven minutes, before leaving again.  By his actions, he contributed to a larger, more violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than a million dollars' worth of property damage. And as explained in more detail, he engaged in a standoff that threatened the lives of Pelham's family, the police, and Pelham himself.

## II.    Factual and Procedural Background

### a.  The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Statement of Facts, ECF No. 1-1 at 1-2.

**b.   Pelham's Role in the January 6, 2021 Attack on the Capitol**

Pelham went to the Capitol wearing a black hoodie, black mask, goggles, and black hat with the insignia of the "Proud Boys" extremist group.  He entered the Capitol through the Senate Wing Door at approximately 3:29 p.m. and stayed in the area, never traveling more than a few yards into the building, before leaving at approximately 3:37 p.m.



*Image 1: Pelham on the Capitol's Terrace*



*Image 2: Pelham inside the Senate Wing*

Pelham's time in the Capitol was brief, but his actions before and after his arrest were notable.  On March 17, 2021, about three months after entering the Capitol, Pelham was detained by U.S. Customs and Border Protection as he tried to cross the border into Canada.  Officers searched Pelham's phone and found pictures of his time at the Capitol.  FBI agents then *Mirandized* and interviewed Pelham.  In the interview, Pelham admitted to walking up the Capitol steps, but denied entering the building.  This, it was subsequently revealed, was false:  as just explained, Pelham entered and remained in the Capitol for about seven minutes.

A review of Pelham's phone showed that he was aware he could not be on the Capitol grounds that day.  In particular, the day after the January 6 attacks, Pelham's wife wrote "It's a good thing you kept your mask on" and "If you have a video of being inside, don't post it," to

which Pelham replied, "I know I am smart honey."  Stored on the phone was the selfie of Pelham (Image 1 above).

On October 21, 2021, FBI agents interviewed Pelham a second time.  Agents showed Pelham a photo of himself in the Capitol and asked Pelham why he didn't previously admit to going into the building.  Pelham said that he'd been instructed to go into the building by police, and that he was in the building for only 10 or 11 seconds.  This too was false:  closed-circuit television footage from the day shows that Pelham was in the building for over seven minutes. And in the now hundreds of cases arising from the attack of the Capitol, there has been no credible evidence that any officer instructed protesters at the Senate Wing Door to enter.

On April 11, 2023, a warrant was issued for Pelham's arrest.  The next day, an FBI agent called Pelham, instructing him to self-surrender the following Monday.  Pelham initially agreed, but on April 12, he called his father, threatening to kill himself.  Police arrived at Pelham's home. One of Pelham's children was there but managed to get out of the house and to the police.  Pelham, apparently drunk, shot several rounds, some towards the police, though fortunately, no one was injured.

According to subsequent police reports, Pelham called his wife, told her goodbye, and said that he planned to make the police shoot him.  Pelham paced outside, holding a gun and yelling at police.  He eventually went back inside and fired the gun several times.  For their own safety, police left the property that night, and let Pelham sleep off his drinking.

For another day and half there was a delicate negotiation between the police and Pelham, helpfully mediated by Pelham's defense lawyer.  Pelham repeatedly promised to turn himself in but failed to do so, only finally self-surrendering at a local police station on Friday, April 14. Pelham was charged with federal felon-in-possession gun offenses, and state offenses for

aggravated assault against a public servant.  On May 8, 2023, he accepted a plea agreement for his actions at the Capitol.

On August 21, the FBI interviewed Pelham as a condition of his plea.  Under the terms of his agreement, Pelham had agreed to give the login information for his various social media accounts and agreed to answer questions about his actions related to the attack on the Capitol. Pelham was evasive, and at times dishonest, on both fronts.  Pelham repeatedly claimed not to know the login information for his own accounts:  his email account, TikTok account, Telegram account, or WhatsApp account.  Pelham also initially denied using email or social media accounts with the word "Wood" (shorthand for "Peckerwood," a white nationalist slang for a man who stands up for himself) until told there was evidence to the contrary, at which point Pelham conceded he used the name for a while.

More importantly, Pelham again said that the Capitol police officers had instructed him to enter the building.  This time, Pelham added a new detail:  he claimed that at the time, someone was breaking a window from the floor above, and that police were instructing rioters to enter for their safety.  Again, there is no evidence that this happened, and footage from the time suggests that it did not.  Rather, it appears that Pelham remained dishonest about why he entered the Capitol.

### c.  The Charges and Plea Agreement

On April 11, 2023 the United States charged Pelham by criminal complaint with violating:

- 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds,

- 18 U.S.C. § l752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds,

- 40 U.S.C. § 5104(e)(2)(D) - Disorderly Conduct in a Capitol Building or Grounds, and

- 40 U.S.C. § 5104(e)(2)(G) - Parading, Demonstrating, or Picketing in a Capitol Building.

As described above, on April 14, 2023, after a standoff with police, Pelham self-surrendered at a local police station.  On May 4, the United States charged Pelham by a four-count Information with violating the statutes above.  On May 17, pursuant to a plea agreement, Pelham pleaded guilty to Count Four of the Information, charging him with a violation of Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Pelham agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Pelham now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Pelham faces up to six months of imprisonment and a fine of up to $5,000.  Pelham must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In this case, as described below, the Section 3553(a) factors weigh in favor of a six-month sentence of imprisonment.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Pelham's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Pelham, the absence of violent or destructive acts is not a mitigating factor.  Had Pelham engaged in such conduct, he would have faced additional criminal charges.

As described above,  on January 6, Pelham walked into the Capitol, stood around for a little over seven minutes, and left.  Yet his behavior after his actions justifies a substantial sentence.  In particular, Pelham lied to law enforcement on three separate occasions:

- On March 17, 2021, Pelham told FBI agents that he did not enter the Capitol (this was false);

- On October 21, 2021, Pelham told FBI agents that he was instructed to enter the Capitol by police (this was false), and that he stayed inside for only 10 or 11 seconds (this too was false);

- On August 21, 2023, Pelham again told an FBI agent that he was instructed to enter the Capitol by police, this time to avoid falling debris from a protester (this was false).  He also claimed not to remember variously his login or password information for his email, TikTok, Telegram, and WhatsApp accounts.  He also denied using the white nationalist "wood" slang in his emails until confronted with evidence showing otherwise.

This is not a passing moment:  Pelham's lies spanned multiple interviews and years and seem to be part of a pattern of behavior.  *See* Nonguideline Misdemeanor Presentence Investigation Report ("PSR"), ECF No. 17 at ¶ 26 (In 2012, when asked by law enforcement for his name, date of birth, and social security number, Pelham gave false information).

Finally, as described above, despite initially agreeing to self-surrender, Pelham threatened to kill himself, shot at police, and suggested that he would act in a way that would force the police

to kill him.  Pelham's endangerment of himself and others in the community, and his refusal to take responsibility suggests that a meaningful sentence is warranted.

### B.  The History and Characteristics of Pelham

As noted in the presentence report, Pelham has a fairly extensive criminal history (PSR ¶¶ 18-28):

- In 2001, he was charged with theft.  He was sentenced to 12 months' probation, 60 hours of community service, and a $600 fine.

- In 2002, he was again charged with theft.  He was sentenced to 30 days' incarceration.

- In 2003, he was charged with evading arrest and using false identification.  He was sentenced to 30 days' incarceration.

- In 2003, he was again charged with evading arrest, burglary, theft of property between $20,000 and $100,000, unauthorized use of a vehicle, and possession of a controlled substance.  He was initially sentenced to probation, but after another violation the next year, his probation was revoked, and he was sentenced to two years' incarceration.

- In 2004, he was charged with evading arrest, unauthorized use of a vehicle, and driving with an invalid license.  He was sentenced to two years' incarceration.

- In 2004, he was charged with assault and unauthorized use of a vehicle.  He was sentenced to one year of incarceration.

- In 2011, he was charged with driving with an invalid license.  He was sentenced to 120 days of incarceration.

- In 2012, he was charged with driving with an invalid license.  He was sentenced to 12 months' probation.

- In 2018, he was charged with bail jumping and failure to appear.  He was sentenced to 12 months' probation.

- Finally, in 2023, he was charged with possession of a firearm as a felon after his shootout with police.

Collectively, these charges show that Pelham does not meaningfully respect the law.  His standoff with police prior to arrest, and his repeated lies to law enforcement collectively suggest that Pelham will do or say what he believes is necessary for his own advantage.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-CR-238 (Hogan, J.), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

9

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-41 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have:  the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

As previously described, Pelham has an extensive criminal history.  He was repeatedly dishonest with law enforcement, and while he has pled in this case, has not demonstrated any remorse for his actions, other than that he has been caught.  Pelham has further failed to absorb the seriousness of his actions, other than as they relate to him.  A substantial sentence is necessary for Pelham to understand how his actions have endangered, not just the lives of officers on January 6 and the night of his standoff, but also our democratic institutions.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2]  This Court must sentence Pelham based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct:  his participation in the January 6 riot.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."  The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Pelham has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Hopkins*, 1:22-CR-317 (Chutkan, J.), the defendant entered the Capitol twice, briefly traveling to the Senate Parliamentarian's Office, as well as Senator Merkley's

hideaway office.  Before January 6, 2021, Hopkins anticipated violence and a civil war, and said that he and another individual should form a "Proud Felons for Trump" group.  After January 6, he minimized his conduct with the FBI.  Hopkins also had a significant criminal history, including a 2002 conviction for forcible rape.  He was sentenced to four months' incarceration and 24 months' probation.  Hopkins's case paralleled Pelham's.  While Hopkins spent more time in the Capitol, both men dissembled to the FBI and carried extensive criminal histories.  And Pelham, unlike Hopkins, engaged in a shootout with the police prior to being arrested.

In *United States v. Spencer*, 1:23-CR-147 (Kollar-Kotelly, J.), the defendant and her husband entered the Capitol with their minor child.  She was present when the police line fell in the Capitol's Crypt, went to Speaker Pelosi's office where staffers hid, and tried to enter the House chamber where Members of Congress cowered.  In a subsequent interview, Spencer minimized her conduct and was not credible.  She was sentenced to three months of incarceration and $500 restitution.  Spencer's conduct was similar to Pelham's.  While Spencer spent more time in the Capitol, both defendants minimized their conduct, and both endangered children (Spencer in the Capitol itself, Pelham in his shoot-out, where police protected his child).  Unlike Spencer, Pelham engaged in a shootout with police.

In *United States v. Register*, 1:21-CR-349 (Kelly, J.), the defendant waved others into the Capitol and spend half an hour in the building himself, traveling through the Crypt, Statuary Hall, and outside the Speaker's Lobby.  Register also destroyed evidence by factory resetting his phone and then lied to the FBI during his initial interview, twice denying that he entered the Capitol.  He also had a criminal history that included two jail sentences.  He was sentenced to 75 days incarceration and $500 restitution.  Register and Pelham were similar:  both evaded responsibility

12

with the FBI and had meaningful criminal records. But Pelham, unlike Register, threatened the safety of the police with his shootout.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The Section 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual Section 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3]  Generally, restitution under the VWPA must "be tied to the loss

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pelham must pay $500 in restitution, which reflects in part the role Pelham played in the riot on January 6.[4]  Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881.360,20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022.  *Id.*  Pelham's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  *See* PSR ¶ 90.

## VI.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Pelham to six months of incarceration, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    <u>/s/ Brendan Ballou</u>
Brendan Ballou
Special Counsel
United States Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 431-8493
brendan.ballou-kelley@usdoj.gov